(152 App. Div. 650.)

CACCIOPPOLI v. LEMMO et al.

(Supreme Court, Appellate Division, Second Department.    October 4, 1912.)

1. DEEDS (§ 207*)—IMPEACHMENT—EVIDENCE—SUFFICIENCY.
     In an action to set aside, as a forgery, an acknowledged deed, impeached under the provisions of Code Civ. Proc. § 936, providing that the certificate of acknowledgment is not conclusive, and may be rebutted, evidence *held* to show the deed to be a forgery, and invalid.
     [Ed. Note.—For other cases, see Deeds, Cent. Dig. §§ 614–624; Dec. Dig. § 207.*]

2. DEEDS (§ 207*)—VALIDITY—EXECUTION.
     Where the owner of property signed a deed through the artifice or trick of a third person, not deeming the instrument to be a conveyance, it is a forgery, and is invalid, though acknowledged.
     [Ed. Note.—For other cases, see Deeds, Cent. Dig. §§ 614–624; Dec. Dig. § 207.*]

3. VENDOR AND PURCHASER (§ 232*)—BONA FIDE PURCHASERS—NOTICE.
     A purchaser under a forged deed is not a bona fide purchaser, where he has made no inquiry of the maker, who was in possession of the property.
     [Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 540–562; Dec. Dig. § 232.*]

Appeal from Special Term, Kings County.

Action by Francesco Caccioppoli against Lorenzo Lemmo and others. From a judgment dismissing the complaint, plaintiff appeals. Reversed and remanded.

Argued before HIRSCHBERG, THOMAS, CARR, WOODWARD, and RICH, JJ.

Samuel Wechsler, of New York City, for appellant.

Lynn C. Norris, of Brooklyn, for respondents Title Guarantee & Trust Company and Emma C. Kornder.

WOODWARD, J.   The plaintiff sues to set aside as a forgery an instrument or deed, dated September 3, 1908, purporting to have been executed by himself and wife, and to convey a house and lot at 469 Carroll street, Brooklyn, to one Lorenzo "Lemmo," whose last name is Lembo, and to set aside also three mortgages given by Lembo upon the property. The learned trial judge, holding the deed valid, that one of the mortgages had been discharged of record, and that the other two were valid subsisting liens on the property, dismissed the complaint on the merits.

[1] He expressed in his opinion, however, "much doubt whether the plaintiff did not in fact sign and acknowledge the deed in question, supposing it, perhaps, to be only a contract. That being so," he continues, "the probative force of the certificate of acknowledgment is not overcome." This is a question of fact, involving an examination of the evidence. The certificate of acknowledgment, or the proof of a conveyance, is not conclusive; and it may be rebutted, and the effect thereof may be contested, by a party af-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

fected thereby. If it appears that the proof was taken upon the oath of an interested or incompetent witness, the conveyance, or the record or transcript thereof, shall not be received in evidence until its execution is established by other competent proof. Code Civ. Proc. § 936.

This whole trouble is directly due, as appears by the evidence, to the misconduct of R. Michael Agolia, a real estate agent and notary public, who certified the acknowledgment to the disputed deed, procured the execution of all the other papers in question, and disappeared at the first intimation of trouble about them, and, though diligently searched for, has not been found. Having acted as agent in the purchase of the property by plaintiff in 1904, Agolia, in the early part of 1908, procured the plaintiff, who cannot read or write, except his own name, and plaintiff's wife, to execute before Agolia a pretended contract to sell the property.

This paper is not in evidence, and all we know of its contents is their testimony of Agolia's statements that it was a contract to sell the property to "Lemmo" for $4,250, $100 cash, $1,900 at the closing of the title, and the remainder to be left in a mortgage, together with the testimony of the wife, who can read our language, that she looked at the paper, and read two or three lines of it, that it provided for a sale of the property for a little over $4,000, contained something about a mortgage, the word "Contract" in large black letters on the back of it when folded up, and that they signed under the name of some person already on the paper, but neither of them could tell whose name.

The fact is, as appears by their testimony throughout, they believed and relied upon the statements of Agolia that he was selling the property to "Lemmo," or Lembo. He paid the $100, and, retaining one copy of the contract, left the other with plaintiff. Seven or eight months thereafter Agolia gave plaintiff $500 on account, saying the man did not have the money, he could not do any better, and "we will settle that afterwards." Plaintiff, having kept his copy of the so-called contract about a year, tore it up, and returned the $600 to Agolia by check to his order, and which he used. Following that transaction, Agolia procured these papers in relation to this property:

(1) A mortgage, dated March 19, 1908, purporting to have been executed by the plaintiff and wife to secure the Title Guarantee & Trust Company in the payment of $1,000 July 19th of that year.

(2) The deed in dispute, dated September 3, 1908, purporting to convey the property to "Lemmo" for a consideration of $100.

(3) Two mortgages, dated September 4, 1908, purporting to have been executed by "Lemmo" and wife—one of them to secure the Title Company in the payment of $2,000 September 4, 1911; the other to secure Salvatore Scarpati in $1,500.

(4) A mortgage, dated November 27, 1908, purporting to have been executed by "Lemmo" and wife before Agolia, to secure Emma C. Kornder in the payment of $1,250, with interest, December 1, 1910.

The Title Company retained sufficient of the proceeds of the $2,000 mortgage to satisfy the previous one for $1,000 and discharged it. But the evidence as to its execution has a bearing upon the case. Application for the mortgage was made upon a card, bearing plaintiff's name, which he says he did not sign. The truth of this testimony is evident at a glance by a comparison of his name on the card with his genuine signature. Whatever the uncertainties in comparing handwriting, there is no room for any here.

The money was advanced upon the mortgage by two checks of the company, and indorsed with plaintiff's name, one for $200 and the other $800. Plaintiff and wife both denied the execution of the mortgage, or that they were ever at the company's office in connection with such transaction. The company admitted, on the trial, that only Agolia was there; and the court found that neither the plaintiff nor his wife was present at the delivery of the mortgage and checks.

The plaintiff testified that he never indorsed or received these checks, or any money, or paid any interest, on account of the mortgage. He is corroborated in this by the facts that the $200 check was cashed right in the office of the company at the time of the mortgage, while the other bears the stamp of an Italian banker, who denied, it seems, that it is his stamp; so it does not appear where the money went, certainly not to the plaintiff. Both plaintiff and his wife deny the execution of the disputed deed, that they ever knew or saw "Lemmo," or Lembo, or ever had any business transaction with him, or that they ever heard of the existence of this or any of the papers in suit, until in November, 1910, as explained below.

Moreover, "Lemmo," a barber and the supposed purchaser of the property from plaintiff, testified in effect that his name is not "Lemmo," but Lembo, and that he was never known by the former name; that he never attended school, and cannot read or write, except his own name, which somebody taught him to write 10 or 12 years ago; that he never saw the plaintiff until the time of the trial, never had any transaction with him in relation to real estate, never saw or received the disputed deed, or a paper of any kind, or any money, from the plaintiff, or paid him anything; that he never lived in or was at the house in question, or visited the place, never collected any rents, or paid taxes on it, or knew anybody who lived there.

His further testimony is to the effect that Agolia, who was a customer of his, asked him as a favor to come down town and sign a couple of papers, saying he was buying a piece of property for himself to sell over again, and wanted to buy it in the name of somebody else, so he could get the commissions. Lembo, on seeing that the name was different, told Agolia his name was not "Lemmo"; but Agolia said the papers were made out that way, it would be too much trouble to change them, told him how to write "Lemmo," and he signed the papers, without knowing what they were or in what office he signed them. Agolia "did not tell me what this was," said the

witness. "He simply asked me to sign the paper, and I signed it. * * * He did not tell me it was a deed, or a mortgage, or anything; simply said he was buying it for himself,. but wanted to take it in somebody else's name."

Later Agolia asked him to come down again, saying he was selling the property; and "Lemmo" went to the office of the Title Guarantee & Trust Company September 4, 1908, where he executed the $2,000 bond and mortgage to the company, which were not read or translated to him, and the $1,500 mortgage to Scarpati, because Agolia said he was selling the property over again. "Lemmo" testified that he did not know Scarpati or get any money from him. Scarpati did not attend the trial, and the court found, upon a satisfaction filed November 14, 1910, that his mortgage was discharged. But little, if anything more, need be said about that mortgage.

The Title Guarantee & Trust Company advanced the $2,000 on its mortgage by two checks—one for $1,037.99 to the order of Lorenzo "Lemmo," indorsed by him, and retained by the company in satisfaction of the so-called $1,000 mortgage of the plaintiff and wife to the company. The other was for $962.01, to the order of Agolia, indorsed by him and "Lemmo," and placed by Agolia in his own account in the Montauk Bank. Agolia, on application for this mortgage, presented the deed in dispute to the Title Company on the day of its alleged acknowledgment before him, and left it with them to be recorded.

The deed, having been recorded, was returned to the company, and mailed by it to Lorenzo "Lemmo" at 188 Fourth avenue, Brooklyn, where, as the court found, Agolia then had a place of business. This is the last account, disclosed in the evidence, of the original deed. Lembo testified that he never had, saw, or received it, and never lived at that address, but at 635 Fifth avenue, Brooklyn, where he had been for about 10 years. He admits he signed the Kornder bond and mortgage, but says he did not know what kind of papers they were. "He [Agolia] did not tell me what this was," said the witness. "He simply asked me to sign the paper, and I signed it."

Lembo further testified that his wife was not present at the signing of any of these papers; that he never got any money on account of these transactions, not even car fare for going to sign the papers; and the first he knew what they were was when he was served with the papers—presumably in this action. His wife testified, in substance, that her given name is not "Filomena," but *Amelia*, and she is never called by any other name; that she is American-born, not Italian, and can read and write; that she never wrote the name "Filomena Lemmo" on any of these papers, or knew anything whatever about them, except her husband told her, on one occasion, that Agolia wanted to buy a piece of property in Carroll street in the husband's name,. so Agolia could get the commission; further, that she never was in her life in the offices where the papers were executed, never saw Taylor, before whom they were acknowledged, nor ever at any time saw, signed, or acknowledged these papers before him, or anybody, anywhere.

She is not only corroborated in this by her husband, but by the testimony of Taylor himself that the "woman" did not come to the office of the Title Company. He took her acknowledgment at a house around Eighteenth street, where he went with Agolia. When asked whether he saw Mrs. Lembo, Taylor answered:

"I would not say that that was the woman, or was not the woman. * * * The supposed husband was there at the same time. * * * The woman did not come to the Title Company. I took the man's acknowledgment there, and I went with Mr. Agolia down there [to the Eighteenth street house]. Q. You don't remember whether it was this woman or not? A. No, sir; I wouldn't swear to it."

Philip Kornder, husband of Emma C., knowing that their mortgage would fall due in December, 1910, asked Agolia, in September of that year, whether "Lemmo" wanted to renew it, and Agolia said, "Yes." Kornder, on going to see the property, found a new tenant there, who said Caccioppoli was the owner, and he did not know "Lemmo." "That," says Kornder, "was the first intimation from any quarter I had that Lemmo was not still the owner. Agolia had paid me interest right up to October 10, 1910. I had given him receipts. My receipts ran to Lemmo."

Kornder wrote plaintiff, November 9, 1910, calling attention to this mortgage, and inquiring what he intended doing in the matter. Plaintiff responded by telephone, and a letter from his attorney, dated November 10, 1910, to the effect that he never executed any such mortgage, or knew anything of its existence. Kornder then sent for Agolia, and they made an appointment to go to see plaintiff on the 13th of that month. But they did not keep the appointment, "because," as Kornder testified, "Mr. Agolia was to meet me in my office, and he did not come." Testifying as to subsequent efforts to find Agolia, Kornder said:

"I went down to his mother's house, where he is residing. I went down, I guess, four or five times. I went [at] 7 o'clock in the morning, 6 o'clock at night, and at all times, trying to catch him; waited around there for about an hour or two. I never saw him after that. He never made any explanation to me."

We may state in this connection that plaintiff's attorney caused diligent search to be made for Agolia by a person seeking to serve a subpoena on him to produce the deed in dispute; but he could nowhere be found. The process server testified that Agolia's wife and mother said they did not know where he was; that he had gone away—"he is very far away from here," etc. Other persons in the vicinity said Agolia had run away some time ago, and "has done a lot of Italian people. * * * Agolia is dead to the world; that his own people don't know where he is," etc.

Plaintiff has had undisputed possession of the property since the time of his purchase, renting it, collecting the rents, and paying the taxes. He and his wife both testified that they never knew or heard anything of any of these matters until they got the Kornder letter in November, 1910. Plaintiff took counsel on the following day, caused a search to be made, and took steps "to free my property," he says, "because I was innocent of that fact"—these incumbrances. It thus

appears by the evidence, which we have stated at perhaps undue length, that this entire matter is the result of a scheme on the part of Agolia to cheat and defraud the plaintiff out of his property. No other conclusion seems reasonably deducible from the evidence.

The first step, or the pretended contract of sale to "Lemmo," was clearly fraudulent, and is an index to all that followed. The plaintiff seems to have acted in perfect good faith in that transaction. But the pretended purchaser knew nothing about it, never had any such transaction with the plaintiff, never saw him until the time of the trial, nor received a paper of any kind from him, or paid him anything. Then came the alleged mortgage for $1,000, which Agolia obtained from the Title Company in the names of the plaintiff and wife. The signature of the plaintiff to the application for this mortgage is plainly a forgery. In addition to this, the delivery of the mortgage and the checks of the company to plaintiff's order, their supposed indorsement by him, and the cashing of one of the checks by the company, all occurred apparently at the same time and place. Yet the trial court found that neither the plaintiff nor his wife was present at that time; and the company admitted that they did not come in contact with the plaintiff in making the mortgage—that only Agolia was there. The plaintiff testified that he did not execute the mortgage, or indorse or receive the checks, or any money, or know anything about that transaction, until in November, 1910, more than two years after Agolia had procured the mortgage to be satisfied and discharged. Agolia's conduct in this matter was, therefore, clearly fraudulent from beginning to end.

And so as to the next step in these proceedings—the deed in dispute, purporting to have been executed by the plaintiff and his wife, and to convey the property to this man "Lemmo." Both plaintiff and wife deny the execution of this or any such paper, and all knowledge or information of its existence, until more than two years after its alleged execution by them. Not only so, "Lemmo," the supposed purchaser, says he did not know the plaintiff, or have any such transaction with him, or pay him anything, or have anything whatever to do with the property, or even know what the various papers were which he signed for Agolia, until he was served with papers in this action, as we take it. Following this alleged deed were the several mortgages procured by Agolia in the name of "Lemmo," who could not read them, and denies any information of what they were until as stated above, or the receipt at any time of any money on account of any of them. Not only so, these papers purport to have been executed also by Mrs. Lembo; but it is entirely clear that she did not sign them, and that the notary's certificate thereto, as well as to the mortgage for $1,000, purporting to have been signed by the plaintiff and wife, must have been obtained by Agolia by some trick or artifice not clearly appearing in the evidence.

The deed in dispute is thus surrounded by these fraudulent transactions, and is supported alone by the mere naked certificate of acknowledgment before Agolia, and nothing else—not another word or item of evidence. Agolia is gone; so is the original deed itself, and under

circumstances which plainly impeach the integrity of both. His certificate of acknowledgment to the deed has, therefore, but little, if any, force as evidence of its execution. Certainly not enough, standing alone, as it does, and denied and impeached, as it is, upon which to deprive the plaintiff of his property, without $1 compensation, or any fraud or misconduct on his part, forfeiting his title or right thereto.

It is intimated, it is true, in behalf of the deed, that plaintiff might have executed it, believing it to be a contract. The only apparent ground for this is the fact that he and his wife did execute a paper before Agolia, some eight months before their supposed execution of the deed. The evidence shows, however, that that paper, not in evidence, was not the deed in dispute, but the supposed contract of sale. The word "Contract," in large black letters, was indorsed on the back of that paper. It was in duplicate, without a seal, and for a consideration of a little over $4,000 ($4,250); while the so-called deed, a copy of which is in evidence, does not appear to have been so indorsed, is under seal, and for a consideration of $100 only. Besides, Agolia paid $600 on account of the alleged contract, which sum the plaintiff returned to him by check, in evidence, a year and five months after the execution of the disputed deed.

The mere possibility or supposition, contrary to the apparently truthful testimony of the plaintiff and wife and other evidence in the case, that they may have, on the misrepresentations of Agolia, executed this deed, believing it to be a contract of sale, is not sufficient ground upon which to uphold either the execution or validity of the deed. Our conclusion is that the deed is a false, fictitious, and forged instrument, and therefore invalid and void for any purpose.

[2] Counsel for the defendants Kornder and the Title Guarantee & Trust Company, not seriously contesting the fact that Agolia may have procured the execution of the deed by fraud or falsehood, claim that the cause of action alleged in the complaint rests entirely upon the ground that the disputed deed is a forgery, and that the plaintiff cannot, therefore, recover on the ground, if true, that its execution was procured by fraud and deceit or misrepresentation. Our conclusion, already stated, makes it unnecessary to consider that question. Nevertheless, a decision by the Court of Appeals (Marden v. Dorthy, 160 N. Y. 39, 54 N. E. 726, 46 L. R. A. 694) may be considered briefly. That action was brought to cancel an alleged deed by the plaintiff to her daughter, and two subsequent mortgages thereon by the latter. The report of the case contains a very meager account of the allegations of the complaint as to the vices in the papers—merely "that the three instruments were fictitious and fraudulent," that the plaintiff never acknowledged the alleged deed, or saw or heard of it until a few days before the action; further, that she never heard of the two mortgages until the same time, "and that the three instruments were absolutely and wholly fictitious and fraudulent." It was found that the plaintiff's signature to the alleged deed was procured by some trick or artifice perpetrated by John F. Dorthy in some way or manner which does not appear and was unknown to the plaintiff;

and that the signature of the officer to the certificate of acknowledgment was genuine, but the same had been obtained by said Dorthy in some manner which does not appear, but without any acknowledgment by the plaintiff to such officer. The court, reviewing the authorities upon the question as to what constitutes forgery, said in part that it is:

"The fraudulent making of an instrument in writing to the prejudice of another's rights. * * * So it is held that forgery may be committed by fraudulently procuring the signature of another to an instrument which he has no intention of signing."

And, quoting approvingly from another court, the learned judge continues:

"It is not necessary that the act should be done in whole or in part by the hand of the party charged. It is sufficient if he causes or procures it to be done. The instrument was false. It purported to be the solemn and voluntary act of the grantor in making a conveyance, to which he had never assented. The whole was done by the hand, or by the procurement, of the defendant. It does not lessen the turpitude of the offense that the party whom he sought to defraud was made in part his voluntary agent in effecting his purpose. If he had employed any other hand, he would have been responsible for the act. In truth, the signature to that false instrument, in a moral and legal point of view, is as much imputable to him as if he had done it with his own hand. * * * When the false making, with an evil design, is proved, artful subterfuges in defense have been disregarded."

Continuing, the court said:

"So that, when the instrument under which the defendants now claim was placed upon the public records, it was nothing but a forgery. It was not only a forgery at common law, but a forgery by statute. The term 'forgery' includes now, as it always did, the false making of a written instrument (Penal Code, § 520); and under section 521 it is forgery to utter or put off as true, with intent to defraud, a forged deed, knowing it to be forged. Placing the so-called deed in this case upon record, with intent to defraud, was an 'uttering or putting off as true,' within the meaning of the statute. Paige v. People, 3 Abb. Dec. 439. Moreover, a false certificate of an acknowledging officer to an instrument purporting to be a deed, that the same was acknowledged by a party thereto, is forgery under section 510 of the Penal Code; and, while the absence of knowledge or a criminal intent on the part of the officer would absolve him from liability, yet that circumstance cannot, of course, change the character of the instrument, of which the certificate is an essential part, or make it any the less a forgery. That the certificate attached to the paper in question was false, is not, and cannot be, denied. It is found that the party to whom the defendants loaned money upon fictitious mortgages procured the officer to make the false certificate by some trick or artifice, and by section 29 of the Penal Code one who directly or indirectly induces or procures another to commit a crime is a principal. People v. Fitzgerald, 156 N. Y. 253, 50 N. E. 846; People v. McKane, 143 N. Y. 455, 38 N. E. 950. The fact that a false and fabricated writing of this character is deposited in a public office for record, and is actually recorded, can add nothing to its legal efficacy. The recording act applies to genuine instruments, and not to forged ones. Albany Co. Savings Bank v. McCarty, 149 N. Y. 71, 43 N. E. 427. It may be that the actual record of such a paper may deceive the unwary; but that circumstance does not change the legal rights of any one. A bank may loan money upon the security of a pledge or mortgage of personal property in the possession of the thief who has stolen it, and the loan may be made in good faith, on the honest belief that the thief who has the possession has the title; but this would not prevent the real owner from pursuing his property

and taking it, wherever he could find it. Knox v. Eden Musee Co., 148 N. Y. 441, 42 N. E. 988, 31 L. R. A. 779, 51 Am. St. Rep. 700. It would not help the bank in that case to allege, as the defendants in this case allege, that it was a bona fide purchaser. It is legally impossible for any one to become a bona fide purchaser of real estate, or a purchaser at all, from one who never had any title; and that is this case. It is equally impossible to construct an estoppel against the real owner upon a forged instrument, placed upon record without the authority of any one; and, of course, the paper in question was no more entitled to record upon the false certificate than if it contained no certificate whatever. Void things are as no things."

So that, while there is little or no evidence that the plaintiff signed the deed, yet, if he did sign it, that fact alone does not warrant the conclusion that it is valid. Forgery may be committed, as we have seen, by fraudulently procuring the signature of another to an instrument which he had no intention of signing.

[3] It is further claimed that, if fraud in the inception of these papers had been pleaded, the defendants Kornder and Title Guarantee & Trust Company would have been protected by their bona fides. But the alleged omission of the plaintiff to charge fraud in connection with or independent of forgery did not prevent the defendants from alleging and proving, if they could, acts or omissions on the part of the plaintiff estopping or precluding him from clearing his title of these clouds upon it. Moreover, all the evidence offered upon that subject was received. The plaintiff has been in possession of the premises at all times since his purchase in 1904; "Lemmo" was never in possession or had anything to do with it—facts which the defendant Kornder ascertained upon mere inquiry at the premises shortly before his mortgage became due.

The witness who closed the $2,000 mortgage for the Title Guarantee & Trust Company testified that he did not know what the inspection, in respect to title, possession, or the like, was in the case and by whom made. "I believe," he said, "that Mr. Agolia simply brought in the deed, and said that he had purchased the property, or his client had, the person whom he represented, and wanted it recorded, and asked us to make the loan."

Here the alleged deed had not even been recorded, as was the case in Marden v. Dorthy, supra. Yet the court there said that, if the parties who made loans on the faith of a false record had but inquired of plaintiff, all the facts would have been revealed.

"They all resided in the same city, and all that was necessary for the mortgagees to do, in order to defeat the fraud and save themselves from loss, was to visit the premises and take note of what such a visit would disclose. In omitting such a plain precaution, the parties who proposed to loan money to Dorthy on the faith of a fictitious paper title have deprived themselves of the right to say that the plaintiff's genuine signature was the primary cause of their loss. * * * The defendants cannot be heard to claim that they were not bound to make any inquiries of the true owner, while insisting at the same time that she is bound by any trick or artifice by means of which her signature was made to appear on a false paper."

The foregoing, as well as much more than was said in that case, is equally applicable here, but we need not further pursue the subject.

Judgment reversed, and a new trial granted; costs to abide the final award of costs. All concur, except CARR, J., not voting.