**In re Ollie M. GRIMES, Debtor.**

**Ollie M. GRIMES, Plaintiff,**

**v.**

**GREEN POINT SAVINGS BANK, Defendant.**

**Bankruptcy No. 191–15343–353.
Adv. No. 191–1520–353.**

United States Bankruptcy Court, E.D. New York.

Nov. 20, 1992.

Queens Legal Services Corp., Jamaica, N.Y., by Na'imah A. Ali, for debtor.

Fried, Frank, Harris, Shriver, & Jacobson, New York City, by Ann Marie Pitschi, Jeffrey Schreiber, of counsel to attys. for debtor.

Dollinger, Gonski, Grossman, Permut & Hirschorn, Carle Place, N.Y., by Matthew Dollinger, for defendant.

## DECISION ON REQUEST FOR PRELIMINARY INJUNCTION

JEROME FELLER, Bankruptcy Judge.

This bankruptcy and the subject litigation are rooted in a seemingly endless saga of the Debtor's tenacious efforts to retain the two-family home in which she has lived for the past twenty-two years. Initially, the Debtor shared the house with her sister and more recently with her married adult daughter. The house has been the subject of various mortgage foreclosure proceedings for the last ten years and the Debtor has not been making payments, including real estate tax payments, for many years in connection with her claimed rights to the premises. This Chapter 13 filing and the instant adversary proceeding add another chapter to the already lengthy story chronicling the Debtor's assorted efforts to keep the house.

The Debtor, Ollie M. Grimes ("Plaintiff" or "Ms. Grimes"), commenced this adversary proceeding to enjoin, pursuant to 11 U.S.C. §§ 105 and 362, Green Point Savings Bank ("Defendant" or "Green Point") from conducting a sale of her residence under a State of New York judgment of foreclosure. Plaintiff asserts present ownership and/or other legal interests in the property and accordingly contends that the house is property of the estate under 11 U.S.C. § 541. As such, according to Plaintiff, the house cannot be sold by Green Point, absent permission of the bankruptcy court, in light of the automatic stay triggered by her Chapter 13 filing.

Green Point rejects categorically Plaintiff's claim to the house. Green Point asserts that there exists no impediment whatsoever under the bankruptcy law to its foreclosure sale. Undergirding Green Point's position that Ms. Grimes has no ownership or other cognizable legal interest in the property are deeds, valid on their face, transferring title to the house from Ms. Grimes and her sister. Subsequently, the initial transferees of Ms. Grimes and her sister conveyed the house by deed to another party, who encumbered the property via a mortgage loan from Green Point. This other party, i.e., the mortgagor, defaulted and now Green Point seeks to conclude its long frustrated attempt to conduct a foreclosure sale.

Ms. Grimes, on the other hand, challenges the validity of Green Point's mortgage by attacking the deeds conveying title to the initial transferees, claiming that these deeds are forged documents. She insists that the signatures on the deeds are not hers or, if the signatures are hers, then she unknowingly affixed the signatures on these documents. Ms. Grimes, in the instant adversary proceeding, seeks to enjoin Green Point's enforcement of its foreclosure judgment, pending the institution and determination of a separate lawsuit to, in effect, cancel as null and void the deeds conveying title to the initial transferees. If Ms. Grimes would be successful in such a lawsuit, the mortgagor who obtained title from the initial transferees would have received nothing and therefore lacked the capacity to encumber the house. The Green Point mortgage would thus be invalid.

Based upon our review of the pleadings, pre and post-trial submissions and the record of the two day trial,[1] we conclude that not only has Plaintiff failed in the attempt to show a likelihood of success on the merits of her contemplated lawsuit, but has not even been able to demonstrate sufficiently serious questions going to the merits to make them fair ground for litigation. In short, Plaintiff has utterly failed to sustain her burden of proof. Accordingly, we deny her request for injunctive relief. To the extent the automatic stay may be deemed technically applicable in light of Ms. Grimes' bare possession of the Property, the stay is lifted to permit Green Point to conclude its foreclosure sale.

### I.

1. In 1970, Ralph Cato, a then boyfriend of Ms. Grimes' sister, Jeanette Mitchell–

---

1. Citations to the transcript of the trial proceedings on October 24, 1991, are "Tr1 at __."; and the trial proceedings on October 31, 1991, are "Tr2 at __." Joint Trial Exhibits are referred to as "Tx __."

Stackhouse ("Ms. Mitchell"), purchased a two family house located at 120–41 200th Street, St. Albans, New York, (the "Property"). On February 16, 1970, Mr. Cato duly executed and delivered to Marschall Associates, Inc. ("Marschall") a purchase money mortgage securing his indebtedness to Marschall in the amount of $26,900, which mortgage was then recorded. Marschall assigned the mortgage to Federal National Mortgage Association ("Fannie Mae"), which assignment was also duly recorded. Thereafter, Mr. Cato conveyed the premises to Ms. Mitchell and her sister, Ms. Grimes, by deed dated May 1, 1970, which deed was recorded the same day. The two sisters both resided at the Property until 1976 or 1977, when Ms. Mitchell relocated to North Carolina. Ms. Mitchell ceased sharing in the mortgage payments after she moved to North Carolina. The burden of the mortgage payments thus fell to Ms. Grimes, who has continued living in the house to the present time.

2. In or about 1982, Ms. Grimes stopped making regular mortgage payments and Fannie Mae commenced foreclosure proceedings. These foreclosure proceedings were stayed when, on December 6, 1982, Ms. Grimes filed a Chapter 13 petition in this Court. This first Chapter 13 case of Ms. Grimes was subsequently dismissed upon Ms. Grimes' failure to attend Section 341 meetings. Two successive appeals were filed, both of which were ultimately dismissed as well. Thereafter, subsequent to the failure of her first Chapter 13 effort, around the fall of 1984, Ms. Grimes was again threatened by Fannie Mae with foreclosure proceedings.

3. Unable to obtain the funds necessary to cure the arrears, Ms. Grimes again sought other means. By responding to an advertisement in a local paper offering help to people having trouble with paying their mortgages, she became acquainted with a man by the name of Terrence Owens. (Tr1 at 54 & Tr2 at 91–92). Both Ms. Grimes and her adult daughter, Deborah Grimes, who was living at the Property with her husband, attended several meetings in or about December 1984 at Mr. Owens' office. Additionally, during this time period, both Mr. Owens and an associate, John J. Rubino, also visited Ms. Grimes at the Property. (Tr1 93 & Tr2 12). During the course of these meetings, several documents were apparently signed.

4. Several days after a meeting on December 3, 1984, a deed bearing that same date ("Deed") was recorded in the Office of the City Register, Queens County. (Tx B). By its terms, this Deed conveyed title to the Property from Ms. Grimes and Ms. Mitchell to Mr. and Mrs. Terrence Owens. The Deed bears the signatures of each of these four parties, as well as the signature and notary stamp of John J. Rubino. Also, the following admonition is inscribed in bold lettering at the top of the Deed: "CONSULT YOUR LAWYER BEFORE SIGNING THIS INSTRUMENT—THIS INSTRUMENT SHOULD BE USED BY LAWYERS ONLY." (Tx B).

5. A few months later, in March of 1985, a correction deed dated January 4, 1985, fixing an error in the Property's description, was also recorded ("Correction Deed"). (Tx C). The Correction Deed bears the same four signatures as found on the Deed, and it too is notarized by John. J. Rubino. Further, this document is specifically labeled in bold letters "CORRECTION DEED" and, just as the Deed, it contains the familiar warning to consult an attorney prior to signing.

6. On May 16, 1985, Mr. and Mrs. Owens proceeded to convey the Property by deed to Rosa Reese, who obtained financing for the purchase by securing a mortgage loan from Green Point. Simultaneous with the closing of title, Ms. Reese duly executed and delivered to Green Point a mortgage securing the sum of $62,500. The Rosa Reese deed and the Green Point mortgage were recorded on June 10, 1985.

7. Ms. Reese defaulted on her mortgage payments and, in November 1986, Green Point commenced a mortgage foreclosure action in state court. *The Green Point Savings Bank v. Rosa Reese, et al*, Index No. 21303/86 (Sup.Ct. Queens County). On November 17, 1986, Green Point served copies of the summons and complaint in the

foreclosure action on Deborah Grimes, the daughter of Ms. Grimes, and on William Wells, the husband of Deborah Grimes. At the time Deborah Grimes and Mr. Wells resided at the property with their mother/mother-in-law, Ms. Grimes. No appearance or response to the Green Point foreclosure action was made by the Grimes family. On May 3, 1990, a judgment of foreclosure and sale was signed by the state court, and a sale at public auction was scheduled for June 27, 1990. One day before the scheduled sale, Ms. Grimes moved by order to show cause to intervene in the foreclosure action, to obtain authorization to file an answer, and to vacate the judgment of foreclosure and sale. In an order dated June 27, 1990, New York State Supreme Court Justice Robert L. Nahman temporarily stayed the sale scheduled for that date, and directed that Ms. Grimes' requests for relief be scheduled for a hearing. On September 26, 1990, Ms. Grimes was deposed under oath in connection with the hearing pending before Justice Nahman ("Deposition").[2] This hearing was ultimately held on March 6, 1991, having been delayed by the withdrawal of Ms. Grimes' attorney and consequent adjournment to afford time for Ms. Grimes to obtain new counsel. Despite notice, Ms. Grimes failed to appear at the hearing held on March 6, 1991, prompting Justice Nahman to deny her motion. An order incorporating Justice Nahman's ruling was settled on notice to Ms. Grimes and her sister, Ms. Mitchell, in North Carolina. Having received no response, Justice Nahman signed an order denying, among other things, Ms. Grimes' request to vacate Green Point's judgment of foreclosure and sale and authorizing Green Point to proceed with its foreclosure action. Justice Nahman's order was duly entered on April 16, 1991. Notice of entry, as well as a copy of the signed order, were served upon Ms. Grimes and Ms. Mitchell.

8. Green Point rescheduled the foreclosure sale for October 17, 1991. On August 12, 1991, Ms. Grimes commenced her second Chapter 13 case with the filing of the instant Chapter 13 petition and several days before the scheduled sale, Ms. Grimes filed a complaint initiating the subject adversary proceeding seeking injunctive relief. By order to show cause dated October 16, 1991, this Court scheduled a trial on the request for injunctive relief. The sale was stayed pending the outcome of the litigation.

9. The trial focused mainly on the events surrounding the conveyance of the Property to Mr. and Mrs. Terrence Owens and both of the implementing documents (i.e., the Deed and the Correction Deed). The principal evidence in the case submitted by Plaintiff in support of the injunction was the testimony of Ms. Grimes. It is upon her own testimony that Plaintiff essentially relies to sustain her burden of proof. Initially, Ms. Grimes stated that while she "honestly [didn't] know whether" the signature on the Deed was hers or not, she was sure that the signature on the Correction Deed was not. (Tr1 at 58–59, 74). Then, on cross-examination Ms. Grimes became strident and confidently asserted that the signature on the Deed was not hers either. (Tr2 at 48). In making these statements, Ms. Grimes seemed to have forgotten her prior sworn Deposition testimony of September 26, 1990, in the state foreclosure court action of Green Point, wherein she stated that both of these signatures "appeared" to be hers. (Tr1 at 63–64 & Tr2 at 54–55—encompassing readbacks from Dep. 14). When confronted with these conflicting declarations, Ms. Grimes responded that she had not told the truth during the Deposition. (Tr1 at 100–01). However, on the next day of trial, Ms. Grimes recanted this "confession" and stoutly professed to have never lied. (Tr2 at 49–50). Instead, she maintained that any inconsistent statements she might have made were the result of confusion. (Tr2 at 49–50, 52–53). Elsewhere, Ms. Grimes attempted to gloss over her sworn Deposition testimony with fine distinctions, claiming that the signatures on the Deed and Correction Deed looked like hers, but that they were not actually her signatures. (Tr2 at

---

**2.** Subsequent references to this Deposition will be "Dep. __."

62–63). On yet another occasion, Ms. Grimes strove mightily to avoid the touchy issues raised by her Deposition testimony. (Tr2 at 65–67).

10. Alternatively, Ms. Grimes claimed that she had been scammed, tricked or induced into signing the Deed and Correction Deed, as such documents were not what she had agreed to sign. According to Ms. Grimes, she had entered into an arrangement with Mr. Owens whereby he would borrow money on her behalf, and use this money to pay off the mortgage debt to Fannie Mae. (Tr1 at 56 & Tr2 at 96). To memorialize this alleged arrangement she claims to have signed, what she termed, an "agreement to borrow money." (Tr1 at 55A–56 & Tr2 at 96). No such document or any document remotely resembling an "agreement to borrow money" was ever produced by Ms. Grimes. Yet, she was adamant that an unseen and unevident "agreement to borrow money" was the document she had signed and not deeds. Ms. Grimes' certainty in this respect stands in stark contrast to statements she made on multiple other occasions, both during her Deposition, and trial, wherein it appeared that her memory was less than clear. For example, at one point during her Deposition Ms. Grimes had only been able to recall having signed a "piece of paper [but she] didn't know what it was." (Tr1 at 64– referring to Dep. 14). During the first day of trial she was repeatedly unable or unwilling to describe with any specificity what she had signed. (Tr1 at 56–59, 66, 91, 96). Ms. Grimes even conceded that she made a habit of signing documents which she had not read, and/or which she did not understand. (Tr1 at 64–66—referring to Dep. 14). Ignoring these inconsistent statements, she determined for purposes of this litigation that she is able to recall exactly what she signed and that it was not an instrument of conveyance. Further, Ms. Grimes went on to proclaim that she had never signed, nor would she ever sign a document transferring title to her home. (Tr2 at 36–38). However, the truth of this statement, like so many others, was quickly discredited by Defendant's introduction of a document entitled "Agreement to sell property [sic]," dated April 12, 1984. (Tr2 at 47–48 & Tx 28). Ms. Grimes reluctantly conceded that the signature on this document was hers. (Tr2 at 45, 47).

11. There were several additional witnesses at trial. Two of these witnesses, Ms. Grimes' sister, Ms. Mitchell, and Ms. Grimes' daughter, Deborah Grimes, identified one of the signatures on both the Deed and the Correction Deed as being that of Ms. Grimes. (Tr1 at 34–35 & Tr2 at 101– 102). A second signature on the two documents was purportedly that of Ms. Mitchell; however, Ms. Mitchell denied having signed either of these two documents. (Tr1 at 18–20). Further, Ms. Mitchell professed not to have even been in the New York area at the time the documents were signed. (Tr1 at 16). Deborah Grimes, however, was in New York at the time. In fact, it was revealed under cross-examination that during the second meeting with Mr. Owens, Deborah Grimes had signed her aunt's name, "Jeanette Mitchell," onto a document. (Tr2 at 74, 100). When asked to examine Ms. Mitchell's signature on both the Deed and the Correction Deed, Deborah Grimes identified these signatures as being in her own handwriting. (Tr2 at 102–103). Nonetheless, she professed to have no idea as to how they ended up on either of these documents. (Tr2 at 104). Instead, she attempted to support her mother's story by asserting that at the request of Mr. Owens she signed her aunt's name onto "an agreement to borrow money," and not on either of these documents. (Tr2 at 99, 103–104). The signing of Ms. Mitchell's name by Deborah Grimes was done in the presence of and with the knowledge and approval of her mother, the Plaintiff herein. (Tr at 103). Both knew full well that the forgery of Ms. Mitchell's name was wrong, but apparently rationalized the misconduct on the grounds that it was necessary to safeguard their residence.

12. Additional testimony was given by John J. Rubino, a former attorney who worked for Mr. Owens during the period that Ms. Grimes had dealings with Mr. Owens, and who notarized the Deed and

Correction Deed.[3] According to Mr. Rubino, he personally witnessed Ms. Grimes affix her signature to both the Deed and the Correction Deed. (Tr2 at 9–10). He further recalled that a woman, introduced to him by Ms. Grimes as her sister—who we now know to actually be Deborah Grimes—signed these documents as well. (Tr2 at 10). As to exactly where these documents were signed, be it at Mr. Owens' office or Ms. Grimes' home, Mr. Rubino was unable to accurately recall. At times he also seemed confused when detailing some of the specifics of his meetings with Ms. Grimes' "sister." However, Mr. Rubino was steadfast in his recollection of the discussions that he had with Ms. Grimes. In particular, he recalled advising her that by signing these documents she would be signing over title to her home. Thus, when he was asked:

"Q. Predicated upon your recollection, sir, do you have any doubt that Mrs. Grimes was aware she was conveying her house in 1984?" He promptly responded:

"A. I have no doubt." (Tr2 at 12–13).

## II.

■ It is well established that a forged deed is a void instrument and will, as a general rule, transfer no title to property. *See, e.g., Marden v. Dorthy,* 160 N.Y. 39, 54 N.E. 726 (1899); *Caccioppoli v. Lemmo,* 152 A.D. 650, 137 N.Y.S. 643 (1912); *Misener v. Femiano,* 137 Misc. 700, 244 N.Y.S. 290 (Sup.Ct.1930). The term "forgery" encompasses not only falsified signatures, but also signatures obtained by artifice, trick or device. *See, e.g., Marden,* 160 N.Y. at 54, 54 N.E. at 730 ("[F]orgery may be committed by fraudulently procuring the signature of another to an instrument which he has no intention of signing."). A respected treatise, New York Jurisprudence, summed up forgery and its consequences under New York law as follows:

If the signatures to a deed are forged, the deed is null and void. A forged deed cannot divest the title of the grantor, and a subsequent purchaser or mortgagee

from the alleged grantee, [even] for value and without notice, will not be protected. The fact that a forged deed is recorded can add nothing to its legal efficacy. Moreover, forgery may be committed by procuring, by some artifice, trick, or device, the signature of the grantor to a deed which he had no intention of signing. Thus, the fact that the grantor was tricked into signing a deed believing it to be some other instrument ... [is] a forgery, making the instrument invalid in the hands of anyone to the same extent that it would have been if the grantor's signature had been actually forged by a third person.

43 *N.Y.Jur.2d Deeds* § 226, at 422–23 (1985) (footnotes omitted).

Plaintiff asserts that the Deed and Correction Deed transferring to Mr. and Mrs. Terrence Owens title to the Property were forged instruments. She claims that she did not sign the Deed and Correction Deed or, if she did, Mr. Owens obtained her signature by deception in leading her to believe she was signing some other document. If any of these assertions were proven, the transfer of title to Mr. and Mrs. Owens would be void and their transfer of the Property, in turn, to Rosa Reese would be a nullity. Green Point, under such circumstances, could not have obtained a valid mortgage interest in the Property because its mortgagor (Rosa Reese) took through a forged deed. Plaintiff now seeks to enjoin Green Point's enforcement of its foreclosure judgment, pending commencement and resolution of a lawsuit whose ultimate objective would be elimination of the Green Point mortgage by way of attacking the transfer of title to Mr. and Mrs. Owens.

■ Preliminary injunctions in our federal courts are governed by Fed.R.Civ.P. 65, made applicable to bankruptcy adversary proceedings by Fed.R.Bankr.P. 7065. Under the standard for preliminary injunctive relief in the Second Circuit under Fed.R.Civ.P. 65, the party seeking such relief must make a clear showing of:

---

**3.** In 1988, Mr. Rubino admitted to converting client escrow funds and voluntarily resigned from the legal profession. (Tr2 at 34). Mr. Owens did not testify at the trial.

(A) irreparable harm; and

(B) either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardship tipping decidedly toward the movant.

*See Joseph Scott Co. v. Scott Swimming Pools, Inc.*, 764 F.2d 62, 66 (2d Cir.1985); *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025–26 (2d Cir.1985); *Green v. Drexler (In re Feit & Drexler, Inc.)*, 760 F.2d 406, 415–16 (2d Cir.1985); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979); *Eastern Air Lines, Inc. v. Rolleston (In re Ionosphere Clubs, Inc.)*, 111 B.R. 423, 431 (Bankr.S.D.N.Y.1990), *aff'd in part, In re Ionosphere, Inc.*, 124 B.R. 635 (S.D.N.Y.1991). Irreparable harm alone is insufficient. To obtain a preliminary injunction, irreparable harm must be coupled with a likelihood of success on the merits of the underlying claims or if such likelihood is not demonstrable, at a minimum, a sufficiently serious question going to the merits and a balance of hardship in favor of the party seeking the injunction must exist.

■ Ms. Grimes was unable to muster independent testimony or other objective evidence in support of the alleged forgery. Although she listed a handwriting expert as a witness to be called at trial to provide testimony relating to the signatures on the Deed and Correction Deed (Debtor/Plaintiff's Pre–Trial Memorandum at 10), no such witness was produced at trial. Notwithstanding Ms. Grimes' testimony that she did not sign the Deed and Correction Deed, even her sister and daughter, both of whom said they were familiar with Ms. Grimes' signature, identified the signatures on the Deed and Correction Deed to be that of Ms. Grimes. Similarly, Ms. Grimes failed to produce independent testimony or other objective evidence supportive of her alternative forgery assertion, i.e., that she was tricked into signing a deed believing it to be some other instrument.

The linchpin of Ms. Grimes' case for a preliminary injunction rested on her own testimony and little more. This testimony was replete with contradictions, indecisiveness, evasiveness and lacked a sense of truthfulness customarily expected of sworn testimony. Ms. Grimes' memory was good when it suited her interests and conveniently bad when that would serve her interests. In the main, her testimony was simply not believable and accordingly cannot be given much weight. In judging the credibility of Ms. Grimes, the Court has taken into consideration Ms. Grimes' intelligence, age, selective amnesia, demeanor while testifying, the reasonableness of the testimony in light of all the evidence in the case, and any interest, bias or prejudice Ms. Grimes might have.

■ Ms. Grimes is not blind, illiterate or stupid, and she has ample intelligence to know what she was signing or, at least, make appropriate inquiry. Further, her daughter Deborah is an alert and bright person. The Deed contained cautionary language in bold type, written in plain English, emphasizing that one should consult counsel before signing and that such instrument should be used only by lawyers. Moreover, in addition to the same bold type admonition, the Correction Deed was clearly labelled "CORRECTION DEED," also in bold type. The labelling and admonitions were ignored and Ms. Grimes signed the Deed and Correction Deed. From the facts herein, there is absolutely no basis to conclude that Ms. Grimes lacked the intention to convey the Property. In late 1984 and early 1985, she had nothing to lose by a conveyance, since the Property would have been foreclosed upon anyway by Fannie Mae. The signing of conveyance documents may well have been an integral component of a Grimes/Owens scheme designed to allow Ms. Grimes' to remain living in the house. In any event, on this record, even if Ms. Grimes did not assent to a conveyance of title, she would nonetheless bear the consequences of signing the documents and be conclusively bound by the Deed and Correction Deed. As the New York Court of Appeals has stated:

Ordinarily, the signer of a deed or other instrument, expressive of a jural act, is conclusively bound thereby. That his

mind never gave assent to the terms expressed is not material. (Wigmore on Evidence, § 2415.) If the signer could read the instrument, not to have read it was gross negligence; if he could not read it, not to procure it to be read was equally negligent; in either case the writing binds him. (*Chicago, St. P., M. & O. Ry. Co. v. Belliwith*, 83 Fed.Rep. 437).

*Pimpinello v. Swift & Co.*, 253 N.Y. 159, 162–63, 170 N.E. 530, 531 (1930).

■ Nor can Plaintiff find comfort in the forgeries of her sister's name on the Deed and Correction Deed by her daughter, Deborah Grimes, and hope by such forgeries to vitiate the transfer of title to Mr. and Mrs. Owens. Ms. Grimes was a willing and knowing participant in the forgeries and is accordingly estopped from asserting that misconduct for her own benefit. *See Kraker v. Roll*, 100 A.D.2d 424, 474 N.Y.S.2d 527 (Sup.Ct.1984); *see also Hockett v. Larson*, 742 F.2d 1123 (8th Cir.1984). Forgery of an instrument may well be a crime and, at the very least, is certainly a public wrong and against public policy. On the facts herein, it would be a reproach to our jurisprudence if Plaintiff was allowed to, in effect, recover property on the strength of the forgeries of her sister's name. *See Mutual Life Ins. Co. of New York v. Armstrong*, 117 U.S. 591, 600, 6 S.Ct. 877, 881, 29 L.Ed. 997 (1886). As one New York Court so succinctly reiterated the general rule applicable here:

> No one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime.

*Kearns v. Manufacturers Hanover Trust Co.*, 51 Misc.2d 34, 37, 272 N.Y.S.2d 535, 540 (Sup.Ct.1966) (quoting *Riggs v. Palmer*, 115 N.Y. 506, 511, 22 N.E. 188, 190 (1889)).

### III.

■ Plaintiff's request for a preliminary injunction is made under 11 U.S.C. § 105(a).[4] Under this Section, the bankruptcy court is empowered to do whatever is necessary to enforce and implement the provisions of the Bankruptcy Code. The power granted to the bankruptcy court under 11 U.S.C. § 105(a) is similar to that provided other federal courts under the All Writs Statute, 28 U.S.C. § 1651 (1988), to issue all writs necessary to aid their jurisdiction. However, as broad as the powers vested in the bankruptcy court under 11 U.S.C. § 105(a) might be, such powers are not unbridled. 11 U.S.C. § 105(a) does not give a bankruptcy court free-floating discretion to issue injunctions. Thus, while 11 U.S.C. § 105(a) grants the bankruptcy court extensive powers to carry out the provisions of the Bankruptcy Code, where the exercise of that power entails the imposition of an injunction, there must be compliance with the requirements for an injunction under Fed.R.Civ.P. 65. *GAF Corp. v. Johns–Manville Corp. (In re Johns–Manville Corp.)*, 26 B.R. 405, 415–16 (Bankr.S.D.N.Y.1983); *Coben v. Apland (In re Golden Plan of Cal.)*, 36 B.R. 95 (Bankr. 9th Cir.1984); 2 *Lawrence P. King, Collier on Bankruptcy* ¶ 105.02, at 105–8 (15th ed. 1992). In sum, the bankruptcy court's injunctive powers under 11 U.S.C. § 105(a) are circumscribed by the standards of Fed.R.Civ.P. 65.

Plaintiff urges that the standards under Fed.R.Civ.P. 65 are relaxed where an injunction is sought under 11 U.S.C. § 105(a). *See Garrity v. Leffler (In re Neuman)*, 71 B.R. 567 (S.D.N.Y.1987) (showing of irreparable harm is not necessary where injunctive relief is sought under 11 U.S.C. § 105(a)). However, on the facts herein, Plaintiff's importunings of relaxed standards are besides the point. As shown above, Plaintiff has failed thoroughly in her efforts to demonstrate a likelihood of success or even a serious question on the merits of cancelling the conveyance of the Property to Mr. and Mrs. Owens.

Plaintiff's argument that the preliminary injunction she seeks should be granted, as such relief is necessary to carrying out 11

**4.** 11 U.S.C. § 105(a) provides as follows: "[t]he [bankruptcy] court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

U.S.C. § 362(a), is without merit. The automatic stay triggered by 11 U.S.C. § 362(a) attaches only to property of the estate. Surely, Plaintiff's unproven, self-serving proclamations of ownership of other legal interests in the Property do not create property of the estate within the meaning of 11 U.S.C. § 541.

■ Having wholly failed to prove her ownership or other legal claims to the Property, Plaintiff urges that her possessory interest alone is sufficient to warrant the issuance of a preliminary injunction. In support of this plea, she urges that "a 'naked possessory' interest can support a preliminary injunction" [5] and as support for this proposition she refers to *dicta* in *Rich–Taubman Assocs. v. Masterworks, Inc. (In re Masterworks Inc.),* 94 B.R. 262, 267 (Bankr.D.Conn.1988). Apart from Plaintiff's mischaracterization of *Masterworks'* corporate Chapter 11 case as a Chapter 13 case, her reliance on that case is unfounded. The *dicta* in *Masterworks* indicates that a possessory interest might be a basis for enjoining a debtor/lessee's eviction under facts warranting invocation of an anti-forfeiture doctrine adopted by the Connecticut state courts and concomitant lease reinstatement. In other words, a possibility of injunctive relief exists where the possessory interest is buttressed by a cognizable residual interest, i.e., a potential lease revival under state law. *See In re W.A.S. Food Serv. Corp.,* 49 B.R. 969, 971 (Bankr. S.D.N.Y.1985). In this case, however, title to the Property was conveyed six and one-half years prior to the filing of the Chapter 13 petition and, most importantly, Plaintiff has failed to even show a legitimately litigable right to possession of the Property. Under these circumstances, Plaintiff's contention that a debtor's bare possession of property warrants the drastic remedy of an injunction is grasping at straws.

Green Point commenced a foreclosure action in November 1986, obtained a valid state court judgment of foreclosure and sale more than two and one-half years ago and scheduled foreclosure sales in June 1990 and in October 1991, both of which were thwarted by legal maneuvers of Plaintiff at the eleventh hour. It is true, as Plaintiff asserts, that possession can be a property interest within the protective umbrella of the automatic stay. *48th Street Steakhouse, Inc. v. Rockefeller Group, Inc. (In re 48th Street Steakhouse, Inc.),* 835 F.2d 427, 430 (2d Cir.1987), *cert. denied,* 485 U.S. 1035, 108 S.Ct. 1596, 99 L.Ed.2d 910 (1988). Nonetheless, it is the conclusion of this Court that Ms. Grimes' technical or *de facto* possession is so tenuous so as to represent, at best, a scintilla of an interest, which interest is insufficient to warrant continued protection of the automatic stay. Green Point's efforts to consummate its foreclosure of the Property have been delayed long enough. Ms. Grimes' scintilla of a property interest, coupled with the protracted frustration of Green Point's state law property rights, constitute "cause" within the meaning of 11 U.S.C. § 362(d)(1) for termination of the automatic stay.

### IV.

■ One final consideration must also be pointed out. A preliminary injunction is an equitable remedy and Ms. Grimes in seeking such remedy would invoke the equitable powers of the court. Yet, she comes before the court sullied and tainted by unclean hands, running afoul of the fundamental tenet that one who seeks equity must do equity. Ms. Grimes knowingly and willingly participated in deceitful conduct involving her daughter's forging the name of her sister, co-owner Ms. Mitchell, on documents. It was these forgeries which enabled the chain of events that ultimately resulted in the issuance of the Green Point mortgage. Whatever role Mr. Owens might have played in the matter has no bearing on whether a preliminary injunction should be issued, for absent Ms. Grimes' participation in the forgery of documents there could have been no Green Point mortgage at all. In short, Plaintiff's unclean hands compel denial of her request for a preliminary injunction. If she does have legitimate grievances, redress for

---

**5.** Debtor/Plaintiff's Proposed Findings of Fact and Conclusions of Law at 12–13.

such grievances must be sought from Mr. Owens and not from Green Point.

Based on all of the forgoing, Plaintiff's request for a preliminary injunction is denied and the automatic stay is terminated so as to permit Green Point to conclude its foreclosure sale.