**In re NEW VALLEY CORPORATION, Reorganized Debtor.**

**NEW VALLEY CORPORATION, Appellant/Cross–Appellees,**

v.

**CORPORATE PROPERTY ASSOCIATES, Appellees/Cross–Appellants.**

Civ.A. No. 98–982.

United States District Court, D. New Jersey.

July 13, 1998.

Mark S. Melodia, Alissa Pyrich, Ben Burke Howell, Tobey M. Daluz, Reed Smith Shaw & McClay, Princeton, NJ, for Corporate Property Associates.

David M. Friedman, Lorie R. Beers, Kasowitz, Benson, Torres & Friedman, New York City, for New Valley Corp.

## OPINION

WOLIN, District Judge.

Corporate Property Associates 2 and 3 ("CPA") filed a claim in New Valley Corporation's ("NV") bankruptcy. After years of litigation and a trial, the Bankruptcy Court determined that CPA should recover $2,888,-469.30 from NV's estate. NV raises three issues on appeal, and CPA cross-appeals on five of the Bankruptcy Court's rulings. The Court has determined that the Bankruptcy Court abused its discretion by using the wrong legal principle when it decided that CPA's improper conduct did not bar its claim. The Court has also found that the Bankruptcy Court should have denied CPA any relief because CPA entered a court of equity with unclean hands. Thus, the Court will reverse the Bankruptcy Court's decision, and will deny CPA any relief. The Court will not address the other issues raised in NV's appeal and CPA's cross-appeal because the Court's decision on the doctrine of unclean hands has rendered those issues moot. Pursuant to Rule 78 of the Federal Rules of Civil Procedure, the Court decided this case without oral arguments.

## BACKGROUND

### I. The Leases and Parties

In 1971 and 1972, Western Union Telegraph Company ("WU") and Western Union Realty Corporation ("WU Realty") entered into three separate leases for three properties—the Moorestown Property, the Reno Property, and the Bridgeton Property. The terms of the leases are identical except for the rent. They are triple net leases, which make the tenant completely responsible for the repair, maintenance, and upkeep of the property.

In November 1981, CPA purchased the three properties and an additional property located in Bridgeton from WU Realty, and became WU's landlord for the Moorestown, Reno, and Bridgeton Leases. In December 1981, WU changed its name to Western Union Corporation ("WUC"), and thus, WUC became the tenant under the three leases. During this time, WUC had a wholly-owned subsidiary called Western Union Financial Services, Inc. ("FSI"). In 1989, WUC made FSI a separate corporate entity so that FSI could hold substantial portions of the assets of WUC's money transfer business. On April 18, 1991, WUC changed its name to NV, and thus, NV became the tenant under the three leases.

On March 15, 1990, Donald Wasson, Director of Real Estate Operations for WUC, sent a letter and signed, proposed consents to assignment ("Consents") to Barclay Jones, then vice president of CPA's general partner. The letter requested that CPA consent to the assignment of the Bridgeton and Reno leases from WUC to FSI. A month later, Jones told Wasson that CPA would not grant the request unless WUC also assigned the Moorestown Lease to FSI. Wasson responded that CPA's demand was unacceptable because WUC premised its request on the facts that FSI was working out of the Bridgeton and Reno Properties and that the decision had been made to abandon the Moorestown Property. Wasson then sent his colleague, Jan Wolpert, a memorandum stating that CPA would not sign the Consents without the inclusions of the Moorestown Lease. For some reason, Jones signed the Consents on April 15, 1990. Although Jones was only a vice president on the date he allegedly signed the Consents, Executive Vice President appears below his signature. He did not attain that position until either June 1990 or April 1991. NV and CPA did not discuss the Consents again until May 1993.

During NV's Plan of Reorganization, the Bridgeton Lease was transferred to FSI. Following that transfer, CPA signed a formal assumption of lease agreement with FSI whereby FSI assumed the liabilities under the Bridgeton Lease and absolved FSI of any liability arising before the assumption. In November 1994, NV also sold FSI to First Financial Management Corporation for $1.2 billion as part of its bankruptcy reorganization. Even though CPA ultimately withdrew

its claim against NV under the Bridgeton Lease, the Court will include facts regarding the Bridgeton Lease where they help complete the story.

## II. The Bankruptcy Proceedings

On November 15, 1991, pursuant to Chapter 11 of the Bankruptcy Code, an involuntary petition for bankruptcy was filed against NV. On March 30, 1993, NV consented to an entry of an order for relief under Chapter 11 of the Bankruptcy Code.

## III. The Leases After the Bankruptcy

### A. Moorestown Lease

On May 24, 1993, the Bankruptcy Court approved NV's rejection of the Moorestown Lease. The base rent contained in the Moorestown Lease was $10.85 per square foot. NV stopped paying rent for the Moorestown Property on July 31, 1991, and stopped paying real property taxes in May 1992.

### B. The Bridgeton and Reno Leases

Near the end of April 1993, NV filed for an application for an extension of time to assume or reject its remaining non-residential leases, which included the Reno and Bridgeton Leases, until its plan of reorganization was confirmed. CPA filed an objection to NV's application on May 14, 1993, but withdrew the objection because it had discovered that the Bridgeton and Reno leases had been assigned from NV to FSI in 1990. CPA faxed copies of the fully executed Consents to NV. After receiving the faxes, John Walters, NV's general counsel, told Wasson to search the files to determine whether NV had ever received the fully executed Consents. Wasson informed Walters that NV had never received such Consents.

On September 8, 1993, Walters wrote CPA's counsel a letter stating that NV was of the position that the Reno and Bridgeton Leases had not been assigned, and that NV or its predecessor had always been the tenant under those Leases. CPA's counsel responded with a letter on September 30, 1993, and recounted what had occurred in 1990. First, he stated that no agreement had been reached on the Moorestown Lease. Then, he wrote that after CPA told NV that CPA would not consent to the assignments of the Reno and Bridgeton Leases unless WUC also assigned the Moorestown Lease, Wasson told Jones that WUC was assigning the two leases with or without CPA's consent. Thus, CPA's counsel stated that its record indicated that WUC assigned the two leases. He added that NV's position was a " 'creative bankruptcy tactic' [that] is completely inconsistent with the operating realities of [FSI]." He concluded: "[W]hether it can be shown that [FSI] operated out of Moorestown, Bridgeton, and Reno as a result of an actual assignment, or by way of a de facto assignment, is the stuff that lawsuits are made of."

On September 30, 1993, CPA filed its first of two Proofs of Claim in NV's bankruptcy proceeding. Although the first Proof of Claim dealt mainly with the Moorestown Lease, CPA included a footnote regarding its position on the Reno and Bridgeton Leases:

> Although the Bridgeton, Missouri, and Reno, Nevada leases were assigned to and assumed by [FSI] a non-debtor subsidiary of the Debtor, because the Debtor has taken the position in this bankruptcy case that the two leases were not assigned, CPA[ ] ... ha[s] included these amounts in its Proof of Claim as a precautionary measure. CPA[ ] ... hereby reserve[s] the right to argue that the Bridgeton and Reno leases were in fact assigned to and assumed by FSI.

Thus, in the first Proof of Claim, CPA argued in the alternative: either it would pursue a claim against NV in the bankruptcy proceeding, or would seek to recover from FSI.

On October 4, 1993, Walters wrote CPA's counsel a letter clarifying FSI's occupancy of the Reno and Bridgeton Properties. Walters wrote that FSI and NV had entered into an agreement whereby FSI could operate out of the Reno and Bridgeton Properties so long as it reimbursed NV for its pro rata share of the expenses associated with the property. Walters added that NV unsuccessfully attempted to assign the two leases in 1990, and that it could not have assigned the leases without CPA's consent.

In late December 1994, NV rejected the Reno Lease. On January 20, 1995, CPA filed its second Proof of Claim. Once again, CPA included a footnote in the Proof of Claim to reserve its right to argue that the Reno Lease had been assigned to FSI:

> Although the lease was assigned to and assumed by [FSI], a non-debtor subsidiary of the Debtor which was sold to First Financial Management Corporation on October 6, 1994, CPA[ ] ... ha[s] filed this Proof of Claim as a precautionary measure because the Debtor has taken a position that the lease was not assigned and, therefore, rejected the lease. CPA[ ] ... hereby reserve[s] the right to argue that the Reno Lease was, in fact, assigned to and assumed by FSI.

### C. CPA's Pursuit of the Assignment Theory

The Court finds it difficult to believe that after arduous pre-trial discovery and a thorough trial, the parties vigorously disagree on how long CPA pursued the theory that NV assigned the Reno and Bridgeton Leases to FSI. NV asserts that CPA pursued the theory until the time of trial. CPA argues that it abandoned the theory in June 1996, one year before the trial. Although CPA pursued the theory during the early part of the litigation, the facts support CPA's argument.

In March 1995, CPA filed its Response to Objections of NV to Proofs of Claim and Motions to Expunge, Disallow and Reduce Claims ("Response to Objections"). Paragraph 16 provided: "At almost every stage throughout this bankruptcy case, [CPA] ha[s] asserted that the Bridgeton Lease and the Reno Lease were previously assigned to FSI and that such leases were not property of [NV]'s bankruptcy estate." Paragraphs 19 and 31 elaborated on CPA's statement in Paragraph 16. Paragraph 19 discussed CPA's lack of discovery: "Some of the factual allegations contained in this response are based upon information available to [CPA]. To the extent that the allegations are based upon information within the possession of [NV] or FSI, discovery is needed in order to bring further light to this complicated set of facts." In Paragraph 31, CPA asserted that it was not relinquishing the contention that NV was the lessee of the Reno and Bridgeton Leases: "To the extent that this Court should find that the Reno Lease was property of [NV]'s estate, this Court should allow the amount asserted, $2,317,497.00, in full as it is based upon rent due under the Reno Lease with the 502(b)(6) cap applied to such amount."

When CPA filed its Response to Objection in March 1995, it was not heavily involved in the pursuit of its claims or in NV's bankruptcy proceeding. In fact, as of March 1995, CPA had only responded to NV's motion to extend time to decide whether to reject or assume the leases, filed the Proofs of Claim, and filed its Response to Objections.

On January 12, 1996, CPA filed its Response to NV's Request for Admissions and Interrogatories ("Request for Admissions"). In Paragraph 2, CPA denied that NV had not assigned the Reno Lease to FSI. However, CPA also cross-referenced its response to Interrogatory 2, which provided:

> If CPA denies Request No. 2 of the Admissions Request, state the following:
>
> (a) when the assignment occurred;
>
> RESPONSE: CPA has made reasonable inquiry and the information known or readily obtainable by CPA is insufficient to be able to admit or deny the admission or respond to this Interrogatory. Response to this Interrogatory may rely on documents which cannot be fully identified by CPA because such documents have not yet been delivered to CPA in response to their Requests for Production of Documents.
>
> (b) list all documents that support such denial; and
>
> RESPONSE: Reno Consent. Additionally, *see* response to 2(a) above.
>
> (c) produce copies of all such documents, to the extent not previously produced to [NV].
>
> RESPONSE: A copy (and the original) of the Reno Consent has been produced. CPA cannot produce all documents that support such denial because responsive documents may be in the possession of

[NV] or FSI and such documents have not yet been delivered to CPA in response to their Requests for Production of Documents. Additionally, *see* response to 2(a) above.

After receiving discovery on the assignment theory, CPA contends that it realized that no express assignment had occurred, and that it would be difficult to prove a *de facto* assignment at trial. Thus, CPA claims that it abandoned the assignment theory, and ultimately released FSI from any liability on the Reno and Bridgeton Leases in June 1996, which is more than one year before trial.

## IV. Pre–Trial Proceedings Before the Bankruptcy Court

CPA's claims against NV arose out of NV's rejection of the Reno and Moorestown Leases. The claims contained three general components: (1) a claim for unpaid rent obligations ("base rent" claims); (2) a claim for unpaid obligations, i.e., utilities, maintenance, and service, which the leases obligated NV to pay, ("additional rent" claims); and (3) a claim for NV's breach of covenants in the leases requiring NV to maintain the properties in good condition ("deferred maintenance claims"). The total value of CPA's claims amounted to $3,499,084.84.

Prior to trial, both NV and CPA moved for summary judgment. On October 29, 1996, the Bankruptcy Court issued an interlocutory decision on NV's motion for partial summary judgment and CPA's cross-motion for partial summary judgment. In denying NV's motion, the Bankruptcy Court held that CPA's Gap Claim is a separate component of CPA's claim and not subject to the statutory cap imposed by § 502(b)(6) of the Bankruptcy Code. The Bankruptcy Court also held that the rejection damages cap in the Bankruptcy Code subsumed CPA's deferred maintenance claims. Moreover, NV conceded that if the Bankruptcy Court determined that CPA should recover, then the recovery should be the full amount allowable under § 502(b)(6) of the Bankruptcy Code.

Immediately before the trial on CPA's claims, NV filed an *in limine* motion that sought to prohibit CPA from presenting any evidence regarding its claim under the Reno Lease. NV argued that CPA should be precluded from presenting any evidence on this claim because it had admitted throughout the litigation that the Reno Lease had been assigned. NV concluded that if it had assigned the lease, then CPA would have no claim against NV. In denying the motion, the Bankruptcy Court held that CPA had never made an unequivocal admission regarding the assignment, and that NV would not be prejudiced if CPA amended or withdrew the admission.

## V. The Trial

The pre-trial motions, rulings, discovery, and stipulations reduced CPA's claims to two components—base rent claims and additional rent claims on both the Moorestown and Reno Properties. During the eight-day trial on NV's objections to CPA's claims, NV objected to the amounts asserted in CPA' claims and sought to disallow the claims because of CPA's alleged misconduct. NV argued that CPA should not be allowed to recover because it had deliberately and wrongfully overstated its deferred maintenance claims for the Reno and Bridgeton Properties and because it had wrongfully asserted that the Reno and Bridgeton Leases had been assigned to FSI.

### A. Maintenance Men

CPA submitted claims for the maintenance men that it employed to care for the Reno and Moorestown Properties after NV vacated them. Samantha Garbus testified that the maintenance men ensured that the properties complied with local regulations, and provided CPA with timely notice when a problem arose. CPA generally employs maintenance men to oversee vacant properties. In this situation, CPA paid its maintenance men on a regular basis. Thus, CPA thought that maintenance men were essential to its effective management of the properties.

Both leases contained the identical Article III, which deals with additional rent:

Section 3.1. The Tenant covenants and agrees to pay, as additional rent, before any interest or additional charge may be added thereto for the non-payment there-

of, all real estate taxes, special assessments, water and sewer charges and other governmental charges, general and specific, ordinary and extraordinary, unforeseen as well as foreseen, of any kind and nature whatsoever, relating to any part of the premises or facilities described in Section 18.1, which have been or shall become payable with respect to any portion of the term of this lease . . . .

## B.  Effective Date of Rejection

In April 1989, CPA learned that WUC planned to close its central telephone bureau at the Moorestown Property. WUC removed most of its equipment and furniture and closed its telephone operations by August 1989. WUC did, however, use a portion of the space for a small sales staff until October 1992. NV removed the remaining equipment in January or February 1993 at the direction of Fred Rossi, an employee of CPA. NV did not formally surrender the property to CPA until March 11, 1993.

Prior to the formal surrender, Wasson visited the property on February 23, 1993. While he was on the premises, he noticed that CPA had removed the carpet tiles, the vinyl floor tiles, and the ceiling tiles. He testified that it appeared as if CPA was preparing the property for a new tenant. Around the same time, NV stopped paying for the upkeep and maintenance of the property.

CPA began marketing the Moorestown Property before NV had formally surrendered or formally rejected the property. In fact, CPA hired Fuller Corporate Real Estate Partners ("Fuller") to market the property in 1991, and Fuller replaced NV's sign with its own in October 1991. Fuller actively marketed the property, and even asked CPA to approve an expansion of the building for a potential tenant in August 1992. Fuller rendered services for CPA until CPA hired the Mertz Corporation ("Mertz") as its exclusive agent.

## C.  Appropriate Rent for the Moorestown Lease

During the trial, NV and CPA disagreed on what rent the Bankruptcy Court should

apply when determining the amount of CPA's claim for post-petition rent under the Moorestown Lease. The Moorestown Property consists of 65,000 square feet of useable space and 6,300 square feet for a mechanical penthouse.

NV produced George Powell, JR., MAI to support its position that the base rent was unreasonable. Powell has been an appraiser since 1978, received his MAI designation in 1987, teaches appraisal techniques at Rutgers University, and has testified as an expert on property valuation. After reviewing the Moorestown Property and commercial and office leasing activity from November 1991 to May 1993 in surrounding areas, he found that the office market in southern New Jersey collapsed during the relevant period. Thus, Powell declared that the fair market rent was $7.00 per square foot.

CPA contended that the base rent in the Lease, $10.85 per square foot, was reasonable because it was within the market range during the post-petition period. In trying to rebut Powell's testimony, CPA produced Maryann Franken who has worked for Mertz since 1988 as a licensed real estate broker and licensed sales associate. She is familiar with the Moorestown Property, but has never testified as an expert before this case and is not an appraiser. She stated that the market base rent for the Moorestown Property during the post-petition period was between $7.00 and $12.00 per square foot, but that the average office transaction was between $8.00 and $10.00 per square foot. However, during her testimony, she conceded that the average deal in southern New Jersey was for 5,000 square feet, and that they "live on deals under 10,000" square feet. Although she asserted she reviewed leases for over 50,000 square feet, she was unable to specify any tenant in such a property. Finally, Franken, on behalf of CPA, attempted to lease the property for $4.50 per square foot in 1994.

## D.  Unclean Hands

In refuting NV's claim that it had unclean hands, CPA explained its reasons for originally asserting the assignment theory. Bar-

clay Jones, Samantha Garbus, and Elizabeth Wagner, all of whom worked for CPA, testified that CPA was confused as to the business arrangement between FSI and NV regarding the Bridgeton and Reno Leases. FSI was the operating entity at both properties, and NV transferred valuable assets, including a number of leases, to FSI. Moreover, testimony showed that NV wanted to transfer the properties to FSI, and a document entitled the "Letter Agreement for Operating Leases" could be read as an assignment of the Bridgeton and Reno Leases.

On the other hand, NV introduced evidence to show that CPA knew that the two leases had not been assigned. For example, Walters stated that CPA never expressed any confusion regarding the tenant of the two properties. In addition, CPA's files do not contain any documents to show that FSI was the tenant under the two leases. More notably, CPA's files contained documents showing that: (1) its accountants received confirmation that NV was the tenant as of December 31, 1991, December 31, 1992, and December 31, 1993; (2) NV gave CPA a Tenant Estoppel Certificate for the Reno Property stating that the property had not been assigned; (3) CPA sent rent increases to NV; and (4) CPA communicated to its investors that NV was the tenant of the two properties. Furthermore, Jones testified that although CPA asserted the assignment theory in the Proof of Claims, he did not know whether the statement was true or false when it was made. He also stated that he told his attorneys that the Consents "were never finalized."

In addition, Wasson, Walters, and Jones all testified that NV and CPA never consummated a deal regarding the assignment of the three leases. More importantly, NV claims that the evidence establishes that the Consents were back dated because April 15, 1990, was Easter Sunday, and because Jones did not hold the title of Executive Vice President in April 1990. Walters testified that he believed that CPA believed that it held valid Consents, and that the Consents were backdated three years because CPA wanted to avoid a situation where NV rejected the leases. Moreover, Richard Brunell, NV's hand-writing expert, conducted ink identification and dryness tests to determine the date of the signature and writing below the signature. He was unable to reach a conclusion for the signature but he concluded to a high degree of scientific certainty that "Executive Vice President" was most possibly written in 1993.

Jones, however, testified that he remembers signing the documents, but could not remember the exact date. He stated that he could have signed them on Easter Sunday. He conceded that the dates and title were not his handwriting, and Eve Berman, the former head of the property management department at W.P. Carey, testified that the title and dates were in her handwriting, but that she could not remember writing them. Berman also stated that she doubted that she wrote on the Consents in 1993, and that no one from CPA asked her to backdate the documents.

During the trial, Jones conceded that in 1993, he knew that it was better for CPA to have FSI as a tenant because it was a solvent subsidiary of NV. He also admitted that unlike a claim against NV, a claim against FSI would not be subject to a statutory cap.

NV claimed that CPA's improper conduct regarding the inflation of claims and the Consents caused it to incur legal fees in excess of $850,000. Marc Bell, NV's Associate General Counsel, testified that NV would have settled CPA's claims if CPA had not asserted the assignment theory.

Despite its assertions about CPA's improper conduct, NV did not do anything or refrain from doing anything because of the Consents. In fact, Walters testified that the Consents did not alter NV's position on the Reno and Bridgeton Leases because they were meaningless to him and he disregarded them. He also stated that the Consents were not the reason that NV and CPA were unable to settle CPA's claims early in the litigation. Furthermore, Walters testified that the Consents did not factor into the sale of FSI. Lastly, NV never spent any money indemnifying FSI because of the Consents.

### E. Bankruptcy Court's Rulings

On December 23, 1997, the Bankruptcy Court issued an Opinion, which made the following rulings. First, the court decided that it would follow the test established in *In re McSheridan*, 184 B.R. 91 (9th Cir. BAP 1995), for determining what items should be included as additional rent under § 502(b)(6)(a). The court then held that the maintenance men that CPA employed to care for the property did not count towards the additional rent claims because they did not fall within Article III in the leases. Thus, the Bankruptcy Court reduced CPA's claims by "$10,912.50 for the maintenance man component of additional rent on the Reno Lease, [ ] $6,000.00 for the maintenance man component of the Gap Claim for additional rent on the Moorestown Lease, and [ ] $18,582.35 for the maintenance man component of rejection damages claim for additional rent on the Moorestown Lease."

Second, the court agreed with the majority rule that court approval is a condition precedent for an effective rejection of a lease under § 365(d)(3). *See, e.g., In re Thinking Machs., Corp.*, 67 F.3d 1021 (1st Cir.1995). The court then stated that it would exercise its equitable powers in making the rejection retroactive to February 23, 1993, rather than May 24, 1993, the date the court signed the order authorizing rejection, because it found that CPA exercised complete control over the property on February 23, 1993. That finding reduced CPA's claims by $200,000.

Third, the court held that the rent in the lease, $10.85 per square foot, was unreasonable when compared to the market, and thus, set the rent for the postpetition period at $7.00 per square foot. In reaching this holding, the court found that Franken's experience did not support her opinion as to the reasonable rate. Thus, it relied on NV's expert's opinion in declaring that the base rent in the Moorestown Lease was unreasonable.

In its fourth ruling, the Bankruptcy Court rejected NV's request that it use its equitable powers and disallow CPA's claims be-cause CPA had unclean hands. The court first determined that CPA had not inflated its deferred maintenance claims. As for the Consents, the Bankruptcy Court found that CPA never believed that NV assigned the Bridgeton[1] and Reno Leases to FSI. "The court suspects that CPA took that position as a negotiating tactic in order to minimize any losses it might suffer as a result of the [NV] bankruptcy." The Court also agreed with Walters's belief that CPA had backdated the Consents: "[I]t is likely that the [C]onsents were backdated and then produced to avoid the prospect of being limited to a lease rejection claim in the [NV] bankruptcy." In reaching that finding, the Bankruptcy Court determined that Jones's lack of memory on when he signed his name was incredible, and that NV's expert was convincing. The Bankruptcy Court also stated that CPA's actions are understandable when one considers the dire financial situation of NV and the solvency of FSI in 1993—FSI was a more desirable tenant. The court also did not believe that CPA was confused as to which entity was the tenant under the two leases because Jones closely oversaw the properties and because ample documents existed to show that NV was the tenant.

After making those findings, the Bankruptcy Court held: "[T]he court perceives no impact on the proofs of claim ... [because] the alleged assignments did not bear on any element of the proof of claim.... [I]t appears to have been a somewhat misguided effort to preserve a right against FSI" if the Bankruptcy Court disallowed its claim against NV. The court emphasized that NV's argument would be more persuasive if CPA's conduct had been directed at it rather than at FSI. The court then rejected NV's argument that CPA's alleged misconduct caused NV to spend money defending CPA's claim because the proceeding involved many complicated legal issues and a large claim. Ultimately, the Bankruptcy Court allowed CPA's claims in the amount of $2,888,469.30.

On January 26, 1998, the Bankruptcy Court issued an Order memorializing its

---

1. In its Opinion, the Bankruptcy Court mistakenly stated Moorestown instead of Bridgeton. This Court has substituted Bridgeton for Moorestown because NV claims that CPA executed the Consents for the Reno and Bridgeton Leases, not the Moorestown Lease.

Opinion. NV appeals the Bankruptcy Court's decision allowing CPA's claims. NV raises three issues in its appeal: (1) the Bankruptcy Court erred in concluding that CPA's conduct did not warrant the disallowance or reduction of CPA's claims; (2) the Bankruptcy Court erred in denying NV's objection that CPA not be allowed to introduce evidence inconsistent with its judicial admissions or regarding NV's obligations to CPA under the Reno Lease; and (3) the Bankruptcy Court incorrectly determined that CPA's claim for rent under the Moorestown Lease for the Gap Period was not subject to § 502(b)(6)'s mandatory cap.

CPA cross-appeals the Bankruptcy Court's decision. It raises five issues in its cross-appeal: (1) the Bankruptcy Court erred in determining that CPA's claims for deferred maintenance were capped pursuant to § 502(b)(6); (2) the Bankruptcy Court should have used the time remaining, and not the amount of rent remaining, under the Leases to calculate the cap under § 502(b)(6); (3) the Bankruptcy Court erred by holding that the reasonable rental rate for the Moorestown Property was $7.00 per square foot rather than the rent set forth in the lease; (4) the Bankruptcy Court mistakenly excluded CPA's claim for the cost of retaining maintenance; and (5) the Bankruptcy Court erred by ruling that the effective rejection date for the Moorestown Lease was February 25, 1993, and not May 24, 1993.

## DISCUSSION

### I. Relevant Legal Standards

■ United States District Courts have mandatory jurisdiction to hear appeals from final orders of bankruptcy judges. *See* 28 U.S.C. § 158(a)(1); Fed.R.Bankr.Pro. 8001(a). On appeal, a district court may set aside a bankruptcy court's findings of fact only if clearly erroneous. *See, e.g., In re Sharon Steel Corp.,* 871 F.2d 1217, 1222 (3d Cir.1989); *General Elec. Credit Corp. v. Nardulli & Sons, Inc.,* 836 F.2d 184, 186 (3d Cir.1988); *In re Brennan,* 198 B.R. 445, 448 (D.N.J.1996). "[A] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm

conviction that a mistake has been committed." *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quotation omitted). The fact that a reviewing court could have decided the matter differently does not render a finding of fact clearly erroneous. *See* Fed.R.Bankr.R. 8013; *Anderson,* 470 U.S. at 573–74, 105 S.Ct. at 1511. In contrast, a district court reviews a bankruptcy court's legal conclusions or questions of law under a plenary or *de novo* standard. *See, e.g., In re Modular Structs., Inc.,* 27 F.3d 72, 76 (3d Cir.1994) (citation omitted); *J.P. Fyfe, Inc. v. Bradco Supply Corp.,* 891 F.2d 66, 69 (3d Cir.1989). If the questions involve both law and fact, courts should apply the appropriate standard to each component. *See In re Sharon,* 871 F.2d at 1222.

### II. Doctrine of Unclean Hands

#### A. Standard of Review

NV and CPA hotly contest what standard the Court should use in reviewing the Bankruptcy Court's decision to not invoke the doctrine of unclean hands. NV frames the issue as whether the Bankruptcy Court properly applied the doctrine of unclean hands in deciding not to reduce or disallow the claims. NV concludes that the Court should review this issue *de novo* because the facts are not in dispute. CPA counters that the proper standard of review is abuse of discretion because the application of the doctrine of unclean hands rests within the discretion of the trial court.

■ Although the Third Circuit has stated that "[a] mixed question of law and fact is found whenever a legal precept is applied to the sum of the facts of a case," *Meridian Bank v. Alten,* 958 F.2d 1226, 1229 (3d Cir.1992) (citations omitted), a district court should reverse a bankruptcy court's application of the doctrine of unclean hands only if the district court finds that the bankruptcy court abused its discretion. *See Barry v. Hialeah Miami Springs Med., Fund,* 184 B.R. 611, 613 (S.D.Fla.1995); *see also Keystone Driller Co. v. General Excavator Co.,* 290 U.S. 240, 245–46, 54 S.Ct. 146, 148, 78 L.Ed. 293 (1933) (discussing standard of

review of application of unclean hands in patent case); *Castle v. Cohen,* 676 F.Supp. 620, 628 (E.D.Pa.1987) (discussing standard of review of application of unclean hands in ERISA case), *aff'd in part* and *vacated in part,* 840 F.2d 173 (3d Cir.1988). Abuse of discretion is the correct standard because when assessing whether to invoke the doctrine of unclean hands, "[courts of equity] must not be bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion." *Keystone Driller,* 290 U.S. at 245–46, 54 S.Ct. 146, 148, 78 L.Ed. 293; *accord Barry,* 184 B.R. at 613; *Castle,* 676 F.Supp. at 628. Abuse of discretion occurs when a court fails to apply the correct legal precepts or bases its decision on clearly erroneous findings of fact. *See Meridian Bank,* 958 F.2d at 1230 n. 2.

■ The Court notes that the determination of whether to invoke the doctrine of unclean hands is an equitable one that can best be made by the trial court. In this case, NV does not challenge the Bankruptcy Court's factual findings or statement of the law, but rather the determination that the circumstances of this case did not warrant the invocation of the doctrine of unclean hands. In essence, NV argues that the court failed to apply the law properly.

### B. Analysis

NV argues that the Bankruptcy Court should have invoked the doctrine of unclean hands to reduce or disallow CPA's claims for five reasons: (1) even though CPA knew that the Reno and Bridgeton Leases had not been assigned, CPA asserted that they were assigned in order to avoid the statutory restrictions imposed by NV's bankruptcy; (2) CPA altered documents to support its assertion; (3) the Bankruptcy Court erred in finding that CPA's actions did not have an impact on this case because FSI was a wholly-owned subsidiary of NV and because NV was obligated to indemnify FSI of any liability under the Reno Lease; (4) CPA should not be rewarded for conduct that might be criminal; (5) the Bankruptcy Court should have granted NV's motion *in limine* because at the trial, CPA contradicted its pre-trial admis-

sion that NV had assigned the Reno Lease to FSI when it stated that NV was liable for the Reno Lease.

■ "It is one of the fundamental principles upon which equity jurisprudence is founded, that before a complainant can have a standing in court he must first show that not only has he a good and meritorious cause of action, but he must come into court with clean hands." *Keystone Driller,* 290 U.S. at 244, 54 S.Ct. at 147. However, "courts of equity ... apply the maxim requiring clean hands only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation." *Id.* at 245, 54 S.Ct. at 147–48; *accord CIBA–GEIGY Corp. v. Bolar Pharm. Co., Inc.,* 747 F.2d 844, 855 (3d Cir.1984), *cert. denied,* 471 U.S. 1137, 105 S.Ct. 2678, 86 L.Ed.2d 696, (1985); *General Dev. Corp. v. Binstein,* 743 F.Supp. 1115, 1134 (D.N.J.1990). In essence, the doctrine applies only to those acts that "in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication." *Keystone Driller,* 290 U.S. at 244, 54 S.Ct. at 148.

■ Although the doctrine of unclean hands can only be applied if the conduct is related to the equity being sought, defendants need not show that plaintiffs' inequitable conduct injured them. *See Gaudiosi v. Mellon,* 269 F.2d 873, 882 (3d Cir.), *cert. denied,* 361 U.S. 902, 80 S.Ct. 211, 4 L.Ed.2d 157 (1959). In fact, injury to the defendant is irrelevant because the doctrine of unclean hands is invoked to protect the court's integrity rather than to defend a litigant. *See id.* at 881 (citation omitted). When a party has unclean hands, courts must "den[y him] all relief whatever may have been the merits of his claim." *Id.* at 881–82 (quotation omitted).

■ The Court finds that the Bankruptcy Court abused its discretion in this case because the Bankruptcy Court applied the wrong legal principle when it based its decision to not invoke the doctrine of unclean hands on a "no harm, no foul" rule, i.e., the doctrine of unclean hands did not apply because the alleged assignments did not bear

on the proofs of claim. As shown *supra,* the Third Circuit has rejected the "no harm, no foul" rule and adopted an approach that looks to protect courts from unscrupulous parties. Thus, this Court must determine whether CPA's conduct violated the doctrine of unclean hands as articulated *supra.*

The Court will adopt the Bankruptcy Court's findings of fact because neither party disputes or contests those findings. The relevant findings of fact are that: (1) CPA never believed that NV assigned the Bridgeton and Reno Leases, but took that position in an attempt to minimize its losses in NV's bankruptcy; (2) Jones testified that he told his attorneys that the Consents were never finalized; (3) NV's handwriting expert was convincing, and Jones's lack of memory on when he signed the Consents was incredible; (4) CPA likely backdated the Consents because it wanted to avoid a limited recovery in NV's bankruptcy; (5) CPA was not confused as to who the tenant was under the two leases because Jones closely oversaw the properties and because CPA's internal documents clearly showed that NV was the tenant.

Legal precedent dictates that this Court invoke the doctrine of unclean hands because the Bankruptcy Court's findings of fact clearly show that CPA's improper conduct was "immediately and necessarily" related to the equity CPA sought before the Bankruptcy Court and definitely affected "the equitable relations between the parties." Fabricating or altering evidence is certainly an affront to the Court that warrants the application of the doctrine of unclean hands. *See Mas v. Coca–Cola Co.,* 163 F.2d 505, 508 (4th Cir.1947) ("It is sufficient to bar relief that plaintiff has been guilty of unconscionable conduct directly related to the cause of action, such as the fabrication of testimony, the subornation of perjury or other like attempt to perpetuate fraud upon the court or take an unconscionable advantage of his adversary."); *Aris–Isotoner Gloves, Inc. v. Berkshire Fashions, Inc.,* 792 F.Supp. 969 (S.D.N.Y.) (finding that doctrine of unclean hands had to be invoked because fabricating testimony was unconscionable), *aff'd,* 983 F.2d 1048 (2d Cir.1992); *Grimes v. Green*

*Point Sav. Bank,* 147 B.R. 307, 316 (Bankr. E.D.N.Y.1992) (denying debtor's application for preliminary injunction against mortgagee because, *inter alia,* debtor "knowingly and willingly participated in deceitful conduct involving her daughter's forging the name of her sister ... on documents."). CPA also committed a fraud on the Court by asserting a theory that it knew to be untrue. Furthermore, although the Bankruptcy Court did not make a finding that Jones committed perjury, it did find that his testimony was incredible because his direct oversight of the three properties and his position with CPA made it unlikely that he would not remember when he signed the Consents. That finding supports the application of the doctrine of unclean hands because it appears as though Jones had "selective memory" regarding CPA's fraudulent conduct. Finally, CPA also defrauded the Court when it alleged that it was confused as to which entity was the tenant under the leases. The Bankruptcy Court found that the documents in CPA's possession showed that CPA knew that NV, and not FSI, was the tenant during the years in question. Thus, the Court must invoke the doctrine of unclean hands to protect its integrity.

The Court's decision to invoke the doctrine of uncleans against CPA mandates that the Court deny CPA any relief. The Court recognizes that denying CPA $2,888,469.30 when the Bankruptcy Court found that CPA's improper conduct did not affect the outcome of this case appears to be a harsh result. However, this Court must hold corporations responsible for their misconceived and improper conduct. Corporate ethics, professionalism, and verity are not lost on this Court, and when corporations denigrate these values through lack of candor in their pursuit of financial gains, this Court has not and will not countenance this type of conduct. Further, the Court has not and will not hesitate to apply the appropriate punishment to protect other corporations, individuals, and the integrity of this Court. Therefore, the Court will reverse the Bankruptcy Court's decision, and will deny CPA its claim because it entered a court of equity with unclean hands.

The Court will not address the other issues raised in NV's appeal or in CPA's cross-appeal because the Court's ruling on the doctrine of unclean hands renders the other issues moot.

## CONCLUSION

For the reasons stated *supra*, the Court will reverse the Bankruptcy Court's decision on the issue of the doctrine of unclean hands, and will deny CPA's claim in its entirety.

An appropriate Order is attached.

## ORDER

In accordance with the Court's Opinion filed herewith,

It is on this 13th day of July, 1998,

ORDERED that the Bankruptcy Court's decision dated December 23, 1997, and Order of January 26, 1998, which memorializes that Opinion, is reversed; and it is further

ORDERED that Corporate Property Associates' claim against New Valley Corporation's bankruptcy estate is denied.